[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
PROCEDURAL BACKGROUND
The plaintiffs, Robert A. Levine and Steven C. Wardlaw brought this action against the defendants, James V. Massey III and the Becton-Dickinson Company. The plaintiffs' original writ was dated April of 1993. A revised complaint was filed in July of 1993. The revised complaint in count one claimed a breach of contract, claiming that money paid to Massey by defendant Becton-Dickinson should have been paid either by Massey or Becton-Dickinson to the plaintiffs, Levine and Wardlaw. Count two of the amended complaint attempted to state a count in interpleader, claiming that Becton-Dickinson Company was simply a stakeholder and that royalties which it owed should be paid to the plaintiffs, Levine and Wardlaw, rather than to the defendant, Massey. In the prayers for relief the plaintiffs claimed an accounting from Massey for any royalties received, damages, interest and costs as well as an order determining the allocation of future royalty payments between the parties and such equitable relief as the court deemed proper. Because the second count was framed as an interpleader, the plaintiffs Levine and Wardlaw requested the award of reasonable counsel fees and disbursements.
The defendants, James V. Massey et al., filed a three count counterclaim. In the first count they claim that Becton-Dickinson, by entering into a consulting agreement with the plaintiffs, wrongfully interfered with contractual relationships. In the second count they claimed that Becton-Dickinson, by entering into the consulting agreements, breached an implied covenant of good faith and fair dealing that it owed to the defendant Massey under CT Page 10129 a license agreement which will be discussed in more detail subsequently. In the third count they claimed that Becton-Dickinson committed deceptive acts and practices which were conduct within trade and commerce as defined in 42-110b and which constituted an unfair trade practice.
At trial the parties were in essential agreement that Becton-Dickinson had done nothing wrong and that it and its counsel might be excused from further participation in the matter. It was further agreed that the three counts set forth in the July 15, 1993 counterclaim could be withdrawn as to all parties.
INTERPLEADER
Connecticut General Statutes 52-484 provides in pertinent part:
 "Whenever any person has, or is alleged to have, any money or other property in his possession which is claimed by two or more persons, either he or any of the persons claiming the same, may bring a complaint in equity, in the nature of a bill of interpleader, to any court which by law has equitable jurisdiction of the parties and the amount in controversy, making all persons parties who claim to be entitled to or interested in such money or other property. Such court shall hear and determine all questions which may arise in the case, may tax cost at its discretion and, under the rules applicable to an action of interpleader, may allow to one or more of the parties a reasonable sum or sums for counsel fees and disbursements, payable out of such fund or property; but no such allowance shall be made unless it has been claimed by the party in his complaint or answer."
Although the interpleader statute when read carefully is probably broader in its scope than it is in its normal application, the normal interpleader action in Connecticut is an action in which the stakeholder deposits a fund into court calling upon the court to divide the money between the other claimants and asks that its expenses for being caught in the middle of the controversy be paid CT Page 10130 from the funds of the claimants.
In the case before the court no claim for interpleader has been made by Becton-Dickinson the arguable stakeholder. Rather the claim has been made by the plaintiffs Levine and Wardlaw. In accordance with the licensing agreement between the parties and the corporation, plaintiffs' Exhibit G, Becton-Dickinson had been making payments in appropriate amounts on a continuing basis. With the exception of accrued funds between payment periods, Becton-Dickinson was holding no stake in the matter. As a practical matter the only reason for the interpleader would appear to be to authorize the payment of attorneys fees on behalf of the plaintiffs Levine and Wardlaw. At a minimum there appears to be noncompliance with 539 of the Practice Book which provides:
 "No trial on the merits of an interpleader action shall be had until, (1) an interlocutory judgment of interpleader shall have been entered; and (2) all defendants shall have filed statements of claim, been defaulted or filed waivers."
In the instant case there has been no interlocutory judgment of interpleader. In addition, while the facts may technically come within the statute, it does not appear to the court to be an appropriate use of interpleader. The statute makes clear that the court "may allow to one or more of the parties a reasonable sum or sums for counsel fees and disbursements." The court denies the interpleader and refuses, following a complete trial of the matter, to enter any interlocutory judgment of interpleader. Even if the court could and should have entered an interpleader order, under the facts of this case the court would have exercised its discretion to refuse to allow the plaintiffs a reasonable sum or sums for counsel fees and disbursements.
James V. Massey III's entitlement to royalties. To some extent all of the parties to the present dispute have treated the dispute as a patent law problem. The court views the major question before it as one of contract law. Wardlaw, Levine and Massey were co-inventors and co-patent holders on a method and apparatus for the measurement of blood counts and other similar tasks. On April 1, 1977 the parties entered into two agreements concerning their mutual undertaking.
The first agreement is set forth in plaintiffs' Exhibit G and CT Page 10131 is an agreement between the three individuals and the Becton-Dickinson Company concerning the licensing of "a quick blood test for certain formed elements in blood (hereinafter called the "invention")." Clearly it was important to Becton-Dickinson to have rights to future improvements to the "QBC Technology" which it was licensing. Plaintiffs' Exhibit G defines "improvements" in paragraph 1.4 as follows:
 ""Improvements" shall mean present and future modifications and improvements made or owned by licensors relating to the invention or to clinical measurements performed using a capillary tube, including but not limited to modifications and improvements coming within the scope of claims of the invention."
The court finds that while the parties were willing to use an expansive definition of "improvements" in the Becton-Dickinson agreement, the individuals, particularly Steven Wardlaw who had a track record as an inventor, insisted on a much more restrictive definition of improvements as between themselves. The parties' agreement to share present and future royalties was memorialized in plaintiffs' Exhibit F. Plaintiffs' Exhibit F provided that the parties have:
 ". . . invented a method and apparatus for the measurement of blood counts and other similar tests for which they have made applications for United States letters patent . . . and desire to define their rights and interests in said invention and in any Letters Patent which they or any of them may obtain relating to the invention;"
Plaintiffs' Exhibit F specifically contemplated the issuance of what became four United States patents. Those patents were placed in evidence as plaintiffs' Exhibit's H, K and L and defendant's Exhibit 4. Exhibit H was patent 4,027,660, the basic patent involved in this dispute. Exhibit K was patent 4,082,085. Exhibit L was patent 4,077,396. Defendant's 4 was patent 4,137,755.
After reciting the specific patents or applications in Plaintiffs' Exhibit F, the parties then went to considerable pain to specially define the meaning of improvements. Exhibit F provides: CT Page 10132
 "Improvements If any of the parties at any time shall make or acquire any improvement or apply for or obtain any patent for any improvement upon said invention, he shall forthwith disclose the same to the others, and shall execute and do all applications, documents, instruments, and other things necessary for obtaining letters patent for and assigning the same, as the case may require, to the end that the same shall be vested in the parties in equal undivided shares or interests, and the same shall be held by the parties upon the same terms and conditions as the Letters Patent to be applied for under Paragraph 1 hereof.
 However, improvements made by and Letters Patent issuing therefrom which relate to the use of capillary tubes, but which are not dominated by any claims contained in any of the patent applications or Letters Patent of the basic invention, shall not be subject to equal shares among the parties. Any such improvements and Letters Patent not dominated by the claims of the basic invention shall remain the property of the inventor. In the event that such improvements or Letters Patent, because of the language of the aforesaid license agreement with Becton-Dickinson become subject to its royalty provisions, that any such royalties paid by Becton-Dickinson to parties other than the inventor shall be paid over by such parties to the inventor. The calculation of such payments will be made to the end that the inventor shall be made whole as though he had licensed his improvement or Letters Patent individually to Becton-Dickinson Company."
ISSUES
1. Was the "Manual Reader" patent 4,156,570, plaintiffs' Exhibit N, part of "the invention," as that term is used in plaintiff's Exhibit F, the agreement between the parties? CT Page 10133
2. Are plaintiffs' Exhibits S, T, and U, (The Autoreader) [letters patent 4,558,947; 4,683,579; 5,023,705], letters patent relating to the use of a capillary tube?
3. Are plaintiffs' Exhibits S, T, and U dominated by any claim and in particular by claim 13 of plaintiffs' Exhibit N (The Manual Reader)?
4. Is plaintiff's Exhibit Y, patent 5,137,832 (The Fibrinogen Patent) dominated by any letters patent of the "basic invention?"
1. The court holds that the Manual Reader was part of the "basic invention" as that term was used in the April 1, 1977 agreement between the parties.
Several matters are clear from the testimony at trial. Clearly, "improvements" was used in a much broader sense in plaintiffs' Exhibit G — The Becton-Dickinson agreement — than the use of the same term in plaintiffs' Exhibit F — the agreement between the parties.
Largely, if not entirely at the insistence of Dr. Wardlaw, the second paragraph of paragraph 4 of Exhibit F was put into the agreement to protect Dr. Wardlaw against certain future claims by the plaintiff Levine and the defendant Massey. Dr. Wardlaw who was in the business of inventing items was concerned from the outset that he not tie his entire inventive future inexorably with Dr. Levine and Mr. Massey.
The court also finds that certain terms commonly used in patent law are used in their normal technical sense in the Becton-Dickinson agreement. It is less clear that patent terms are necessarily used in their technical legal sense in the agreement between the parties.
The agreement between the parties acknowledged that the parties had jointly invented a method and apparatus for the measurement of blood counts and other similar tests for which certain patent applications had been submitted. There is little doubt that if one reads plaintiffs' Exhibit F and examines the references to applications for patents, dates of filing, and matters that have been allowed, the paragraph is specifically referring to the patents that were introduced at trial as plaintiffs' Exhibits H, K, and L and defendants' Exhibit 4. The CT Page 10134 first question which the court must answer is whether the "invention" is a term which includes any patents or processes which are broader than the four enumerated patents.
It appears to the court that when all is said and done it was the intention of the parties to share the profits on those inventions which were known to the parties at the time of entering the agreement on April 1, 1977 and to likewise share improvements which were dominated by the known inventions. It is conceded that the defendant Massey has a one-third interest in the Manual Reader patent. The court is convinced that the purpose of the QBC Technology from the outset was to read certain types of blood counts. This was initially accomplished by expanding the buffy coat components by a factor of four using the tube and float. This process was described in the basic patent application. The last sentence of that application provided "after a three minute wait, the device is placed in a reader." Clearly, as early as 1976 Dr. Wardlaw was working on a "reader." In the transcript of September 28, 1993 at page 25 the following exchange occurred between the court and the witness Levine:
The court: "What did you mean by "reader?""
 The witness: "We did not have a reader as you or someone else would understand a reader to be. We had a device that held the tube and allowed its accurate measurement of its layers, which gave, as I said, lengths."
Later on the same page, the following exchange occurs with witness Levine:
 Mr. Minogue: "Well you knew that Dr. Wardlaw, in 1976, at the time he was working in his laboratory, was working on a reader, didn't you?"
 Answer: "I do not believe that the reader was being worked on in 1976, I'm not — Mr. Minogue, I'm not exactly sure."
However, later at page 26 of the same transcript defense counsel engaged in the following exchange with witness Levine:
Question: "Showing you what has been admitted CT Page 10135 as Dr. Steven Wardlaw's lab notes of 2 December, 1976 defendants' Exhibit 2, what is the reader that he is talking about in that?"
 Answer: "This is the first time that I have seen this and I must look at it. May I have a few moments?"
The court: "Yes."
 Answer: "It appears to be describing the Blue Manual Reader. And it was the date — this appears to be an invention disclosure for constructing the Manual Reader. Its date is December 6, 1976, several months after we had made our presentation to Dr. Evanega."
Skipping several questions and answers the following exchange then takes place:
 Question: "But in 1976, Dr. Wardlaw was working on the development of a Manual Reader."
Answer: "Quite definitely."
Question: "By his own laboratory notes?"
 Answer: "Yes, on December 2, 1976 he had invention disclosure."
Question: "Yes."
 Answer: — which looks like the patent application to me, which looks like it was converted into a patent application."
In short the combination of Dr. Wardlaw's diary of the invention process and Dr. Levine's testimony appears to make it clear that sometime in 1976, clearly prior to the parties' agreement in 1977, the Manual Reader in the form that was introduced at trial was well along in the invention process. Because the Manual Reader appears to have existed as a clear concept, it is the holding of the court that it is within the contemplation of the parties when they talk about "the invention" CT Page 10136 in the agreement between the parties to share profits.
2. Are plaintiffs' Exhibit's S, T, and U (the Autoreader Patents) patents relating to the use of a capillary tube? While there was a great deal of conflicting testimony as to whether the Autoreader could be operated without a capillary tube, there is no question that the Autoreader as presently marketed and using the present computer software operates with a capillary tube. The court holds that the Autoreader is an invention which uses a capillary tube.
3. Are the patents set forth in plaintiffs' Exhibit S, T, and U dominated by any claim and in particular by claim 13 of the Manual Reader Patent, plaintiffs' Exhibit N? The court recognizes that in all probability the two most hotly contested issues in the case before it were whether or not the Manual Reader was within the definition of invention in the agreement between the parties and even more importantly whether the Manual Reader claim 13 dominated the Autoreader. Clearly, at at least one point in time the parties' own attorney, Attorney Jones, believed that there was domination. Clearly, at one point in time Dr. Levine believed that there was domination although his opinion may have been based entirely upon advice received from Attorney Jones. The court also recognizes that domination in a technical patent sense involves the comparison of claim to claim and not physical device to physical device. From time to time these lines seem to blur in the questioning of various witnesses.
The court recognizes the high degree of professionalism and legal expertise, particularly in the area of patent law, that was brought to the argument by all counsel involved. Recognizing the importance of the concept of dominance, the court feels it only fair to define "dominance" for the purpose of this decision. The court has adopted the definition of dominance which appears in In Re Kaplan 789 F.2d 1574, [789 F.2d 1574], (Fed. Cir. 1986). The definition which the court is using is set forth in Kaplan as follows:
 "By dominance we refer, in accordance with the established patent law terminology, to that phenomenon, which grows out of the fact that patents have claims, whereunder one patent has a broad or "generic claim which "reads on" an invention defined by a narrower or more specific claim in another patent, and former "dominating" the latter because the more narrowly claimed invention cannot be practiced CT Page 10137 without infringing the broader claim. To use the words of which the board seems to be enamored, the broader claim "embraces" or "encompasses" the subject matter defined in the narrow claim. In possibly simpler terms, one patent dominates another if a claim the first patent reads on a device built or process practice according to the second patent disclosure."
Kaplan at 1577.
On the question of domination, the defendants' expert Harry Angel in extensive examination and cross-examination testified that in his opinion the Autoreader was dominated by claim 13 of the Manual Reader Patent. The court recognizes that to some extent Mr. Angel's testimony was weakened on cross-examination by plaintiffs' counsel's assertion that he was comparing device to device rather than claim to claim. Nevertheless, his testimony appears to satisfy the Kaplan test of claim to claim domination.
Following a lengthy examination of Mr. Angel by both attorneys the following exchange took place between the court and the witness.
 The court: "I come to you with the idea of an Autoreader; it's never been patented; I say, let's form a partnership, or whatever we do, we'll patent it. You know the Manual Reader exists and you know that I have absolutely no rights in the Manual Reader; would you be interested in making a deal with me on the Autoreader?"
The witness: "No I wouldn't."
The court: "Why not?"
 The witness: "Well, because I think the Manual Reader dominates the Autoreader and any invention that I could conceive that would go beyond the Manual Reader, would be so dependent on the Manual Reader invention, and its patents, that I think they'd be infringed." CT Page 10138
In short Mr. Angel who has a masters degree in engineering and has been in the patent invention business for some twenty-five years and who testified that he was familiar with both the Manual Reader and the Autoreader felt that the Manual Reader dominated the Autoreader. Transcript September 28 at page 264.
4. Is plaintiffs' Exhibit Y, 5,137,832 (the Fibrinogen patent) dominated by any letters patent of the invention? The court holds that the Fibrinogen patent is not an invention using a capillary tube and is not dominated by any other letter patent.
The Transcript of September 22, 1993 at pages 27-32 contains an extensive examination of Dr. Wardlaw concerning the similarities between the basic 660 patent and the Fibrinogen patent represented by plaintiffs' Exhibit Y. The testimony supports a conclusion that when one examines the claims, the Fibrinogen invention differs from the QBC in that it is not designed to measure cells. The Fibrinogen layer is not expanded. Becton-Dickinson fibrinogen tubes cannot be used as QBC tubes. The float in the Fibrinogen patent performs no function other than separation and there is nothing in Exhibit Y which requires expansion greater than 4. The comparison was summarized by an answer given by the plaintiff Dr. Wardlaw at the bottom of page 30 and continuing on to page 31 of the transcript of the proceedings of September 22. The transcript provides:
 "Answer: Yes. The capillary tube and float is designed to expand a very small cell layer that's trapped between the float and the tube. The Fibrinogen invention uses a separator, which can be a float, simply to push all the cells out of the way or keep them away from the fibrinogen that's going to be precipitated on top of it. There is no expansion; we are not measuring anything remotely associated with the cellular component of blood.
 Question: In your opinion, is the Fibrinogen invention an improvement over the capillary tube and float plus the expansion factor of four?
Answer: No it's completely unrelated." CT Page 10139
Defendant in his special defenses alleged the statute of limitation, waiver, estoppel and leeches. None of the defenses were seriously pursued at trial and the court finds each defense without merit.
Plaintiffs in their post trial brief made certain claims under the doctrine of claims persuasion. Whatever effect this doctrine may have in the event of future litigation between the parties, the court finds no significance to the doctrine as it affects the present controversy.
Plaintiff also make the claim that by withdrawing his counterclaims, Massey has forfeited his right to certain royalties. The fact is that the defendant voluntarily withdrew his counterclaims largely as an accommodation to Becton-Dickinson. No judgment has entered against him on the counterclaim. Therefore the court sees no merit to the plaintiffs' position in this issue.
In conclusion, the court holds that Mr. Massey is entitled to a payment of one-third of the royalties due on the Autoreader until the date of the expiration of the Manual Reader patent. Mr. Massey is entitled to no payments on the Autoreader after the expiration of the Manual Reader patent. The court further holds that Mr. Massey is entitled to no royalties on the Fibrinogen patent and if he has received any royalties on that patent, he is responsible to repay those royalties in accordance with the agreement between the parties equally to Dr. Levine and Dr. Wardlaw.
Since there appears to be no disagreement between the parties concerning what royalties have been paid to whom and for what, the court sees no need to order an accounting in light of the court's decision in this matter.
Kevin E. Booth, Judge CT Page 10140